United States District Court
Southern District of Texas
**ENTERED**
June 30, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| STEPHEN TARLTON DOUGHERTY, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:21-CV-00233 |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND RECOMMENDATION

Petitioner Stephen Tarlton Dougherty is an inmate in the Texas Department of Criminal Justice and is currently incarcerated at the Michael Unit in Tennessee Colony, Texas. Dougherty filed a counseled habeas corpus petition pursuant to 28 U.S.C. § 2254 on October 1, 2021. (D.E. 1). Dougherty challenges his conviction for aggravated sexual assault of a child under 14, raising claims that his Fifth, Sixth, and Fourteenth Amendment rights were violated during trial. Respondent filed a motion for summary judgment, to which Dougherty has responded. (D.E. 6, 10). Dougherty also filed a "Reply to Respondent's Answer" (D.E. 11). However, Dougherty did not obtain leave to make such a filing, which is only allowed if the Court orders it, and this filing (D.E. 11) is **STRICKEN**. Fed. R. Civ. P. 7(a)(7). As discussed more fully below, it is respectfully recommended that Respondent's motion for summary judgment (D.E. 6) be **GRANTED** and Dougherty's habeas corpus petition be **DENIED**. It is further recommended that a Certificate of Appealability ("COA") be **DENIED**.

## I.   JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is appropriate because Dougherty was convicted in Bee County, Texas.  28 U.S.C. § 2254(a); 28 U.S.C. § 124(b)(6); *Wadsworth v. Johnson*, 235 F.3d 959, 961 (5th Cir. 2000).

## II.   BACKGROUND

### a.   Petition and Claims

In his § 2254 petition, Dougherty first contends that his due process rights under the Fifth and Fourteenth Amendments were violated when the prosecution used false testimony to obtain his conviction.  (D.E. 1 at 6-8).  Specifically, Dougherty contends that SLH,[1] the complainant, initially reported that she was 15 when the sexual assault occurred, but then testified at trial that she was 13, and that SLH's counselor also changed her testimony to reflect that SLH was 13 instead of 15.  He contends there were also other discrepancies regarding whether SLH had previously been molested.  (*Id.*).  Second, Dougherty asserts that his right to confrontation under the Sixth Amendment was violated when the trial court admitted a letter from a man stating that Dougherty molested him in 1982 when the man was 8-9 years old.  (*Id.* at 10).  Finally, Dougherty contends that his Sixth Amendment right to compulsory process was violated when the trial court quashed a subpoena for Rhonda Visser, an intake officer who could have authenticated records indicating that the sexual assault occurred when SLH was 15 to 16 years old.  (*Id.* at 11).  He argues that, as

---

[1] The complainant was referred to by name at trial.  However, the parties now refer to her either as Complainant or by her initials, SLH.  To avoid confusion, this memorandum refers to her by her initials, SLH.

a result, he was unable to impeach contrary testimony that SLH was younger when the sexual assault occurred.  (*Id.*).

### b.  State Court Records

In June 2016, Dougherty was charged in an indictment with one count of aggravated sexual assault of a child under 14 years of age, in violation of Texas Penal Code § 22.021. (D.E. 5-16 at 6).

During the first trial,[2] the state sought to introduce a December 2011 letter from Roberto Benavidez to the Diocese of Corpus Christi in which Benavidez stated that Dougherty sexually assaulted him in 1981 and 1982 when Benavidez was 8 and 9 years old.  (D.E. 5-18 at 4-21; D.E. 5-33 at 3).  Benavidez indicated that his father was the foreman at Dougherty's ranch and that Dougherty lived in the ranch house with the Benavidez family at the time the abuse occurred.  (D.E. 5-33 at 3).  The state also sought to introduce a December 15, 2011, "Agreement for Leave from Priestly Ministry" signed by Dougherty and Bishop Michael Mulvey in which Dougherty admitted to the assaults that Benavidez alleged and agreed to take administrative leave.  (D.E. 5-18 at 4-21; D.E. 5-33 at 5).  The leave began on December 16, 2011.  (D.E. 5-33 at 5).  The first trial court admitted both exhibits under the hearsay exception for an admission by a party opponent. (D.E. 5-18 at 16-18).

---

[2] The jury could not reach a verdict in Dougherty's first trial, and his conviction followed a second trial.  (*See* D.E. 5-1 at 6).

Prior to the first trial, the Texas Department of Family and Protective Services ("DFPS") indicated that it was unable to locate any record of SLH, her mother, or the case. (D.E. 5-16 at 198).  Prior to the second trial, DFPS moved to quash the subpoena for Visser, reiterating that it could not find any records regarding this case and that Visser, an intake officer, had no independent or relevant knowledge regarding any records in this case.  (*Id.* at 257-59).  At a pretrial hearing, DFPS argued that the records regarding this case had been purged and reiterated that any testimony Visser could give was hearsay.  (D.E. 5-24 at 15-16, 21).  Dougherty asserted that he was given a copy of the intake records by the District Attorney's Office.  (*Id.* at 20).  The trial court stated that it would allow Dougherty to brief the hearsay issue, but that it would abate the enforceability of the subpoena unless convinced otherwise by the briefing.  (*Id.* at 22-23, 25-27).  At the same hearing, the trial court denied a motion to quash from Bishop Mulvey that argued anything Dougherty told him in their December 2011 meeting was protected under Texas Rule of Evidence 505 as a confidential communication with a clergy member.  (*Id.* at 54-56).  The court noted that anything Bishop Mulvey testified to in the previous trial was no longer confidential.  (*Id.*).

At the start of trial, the court reiterated its ruling regarding what testimony it would permit from Bishop Mulvey and also stated that it would not overrule any evidentiary rulings made by the original trial court.  (D.E. 5-26 at 16-18).

Bishop Mulvey testified to the following.  (*Id.* at 58).  In December 2011, he received a letter from Roberto Benavidez.  (*Id.* at 59).  After receiving the letter, Mulvey informed the Bee County District Attorney's Office and sought a meeting with Dougherty

as soon as possible.  (*Id.* at 62).  At the meeting with Dougherty, Mulvey presented the letter and Dougherty admitted that the allegations were true.  (*Id.* at 63).  Mulvey read the letter to the jury.  (*Id.* at 64-65).  As a result of Dougherty's admission, Mulvey placed him on administrative leave.  (*Id.* at 67).  The leave began on December 16, 2011, and was still in effect at the time of trial.  (*Id.* at 69).

Sheryl Hunt, and victim's grandmother, testified to the following.  (*Id.* at 77). Although she was SLH's grandmother, she raised SLH as her daughter.  (*Id.* at 78).  SLH moved in with her grandparents permanently when she was 6 years old and referred to them as "mom" and "dad."  (*Id.* at 79-80).  Dougherty was friends with Hunt's husband, Jimmy Hunt, since they were children.  (*Id.* at 82).  When they lived at the San Domingo Ranch, Dougherty visited once or twice a week and would sleep on a couch in the living room.  (*Id.* at 82-83).  Dougherty and Jimmy Hunt then entered a business arrangement in which Dougherty provided the land and capital for a new ranch, and Hunt managed the new ranch.  (*Id.* at 83).  As part of the arrangement, Dougherty built a house for the Hunts to live in at the ranch.  (*Id.* at 85).  Dougherty also had a bedroom in the house.  (*Id.* at 86). He stayed at the house once or twice a week.  (*Id.* at 87).  Prior to December 2011, SLH was a happy little girl who loved to do everything and was comfortable around adults.  (*Id.* at 92).  However, around Christmas of 2011, when she was 13 years old, she started to become withdrawn and stayed in her bedroom all the time.  (*Id.* at 94-95).  She also quit her hobbies, including ballet and singing, and began having nightmares.  (*Id.* at 95-96, 98). In October 2013, Dougherty informed Sheryl and Jimmy Hunt that he was selling the ranch

and they had to move within 45 days.  (*Id.* at 99).  The Hunts subsequently sued Dougherty and the case settled in January 2015.  (*Id.* at 101-03, 109).  While Hunt was packing up their belongings, she emptied the dresser in Dougherty's room and found a pair of SLH's underwear in one of his drawers.  (*Id.* at 105-06).  Dougherty began acting differently in December 2011.  (*Id.* at 106).  He would come into the house "ranting and raving," yelling at anybody in the house and using vulgar words, and coming in late at night, among other changes.  (*Id.* at 107).  On cross-examination, Hunt denied that she told Debra Sublett, SLH's therapist, that the sexual assault likely happened when SLH was 15.  (*Id.* at 144).

Teralea Jones, a physician assistant, testified to the following.  (*Id.* at 215).  On January 5, 2012, SLH was diagnosed with a urinary tract infection.  (*Id.* at 223).  There were several potential causes of a urinary tract infection, but sexual contact was one possible cause and it was unusual for a 13-year-old to have such an infection.  (*Id.* at 223-24).  In March 2014, Jones again saw SLH, who presented with issues of insomnia, anxiety, occasional panic, and depression.  (*Id.* at 234).  Jones's notes indicated that the family had legal issues with Dougherty and that "[t]here was no concern for sexual molestation," but that both Sheryl Hunt and SLH were uncomfortable in his presence.  (*Id.*).  Jones asked the question about sexual abuse and SLH answered it in the presence of Sheryl Hunt.  (*Id.* at 235).  SLH continued to visit Jones with reports of anxiety, depression, insomnia, bulimia, and several other issues, and obtained different prescriptions to address the issues.  (*Id.* at 236-39, 242-46).  These symptoms were consistent with some type of trauma in SLH's life.  (*Id.* at 246).

Outside the presence of the jury, Dougherty questioned Visser on a bill of exceptions. (D.E. 5-27 at 20). She was an intake officer who worked the DFPS Abuse and Neglect hotline. (*Id.* at 21). She agreed that she would ordinarily generate a document like the one Dougherty obtained after receiving a report of sexual abuse. (*Id.* at 23-24). She remembered generating the document in question. (*Id.* at 25). She received all the information in the report from a caller, but she was not allowed to reveal who made the report. (*Id.*). Her job did not involve any additional investigation, but instead consisted only of receiving information from callers and determining if the report should be recommended for investigation. (*Id.* at 27). There was no question in her mind that she prepared the document in question, but she also could not say that there had been no alterations or deletions to the document since she filed it. (*Id.* at 30-31). The court again concluded that Visser's testimony would be hearsay to which no exception applied. (*Id.* at 34).

Debra Sublett, a licensed professional counselor, testified to the following. (*Id.* at 65). She first saw SLH for a counseling session in April 2014. (*Id.* at 68-69). Sheryl Hunt reported that SLH was suffering from anxiety and depression, along with some physical ailments. (*Id.* at 70, 72). When recounting her history, SLH mentioned that she had dealt with anger and physical abuse from her birth father and that she had been sexually molested by a teenage boy when she was six years old. She did not provide any details about either of these previous issues. (*Id.*). When asked what was causing her current stress, SLH stated that it was caused by Dougherty, who "used to stew and say things that made [her]

very uncomfortable." (*Id.* at 72).  She also mentioned that her family had legal issues that were stressful.  As to Dougherty, SLH further reported that he sat too close to her on the couch when there were other places to sit and gave her frontal hugs that she did not want. (*Id.*).  In contrast, SLH only mentioned the family's legal issues in passing.  (*Id.* at 73).  At a second counseling session in April 2014, SLH again reported stress about the family's finances and legal involvement.  (*Id.* at 74).  She also provided more details about Dougherty, stating that he tried to touch her outside her clothes and sometimes tried to go under her clothes as well.  (*Id.* at 75).  After these first two sessions, SLH never again mentioned the legal issues, any abuse by her birth father, or the incident when she was 6 years old.  (*Id.* at 76).

Sublett further testified that at a third counseling session in July 2014, SLH reported that she was trying to put the incidents with Dougherty behind her and not think about them anymore.  (*Id.* at 77).  In a fifth session later that month, she did not refer to Dougherty. (*Id.* at 78).  At the next session in October 2014, SLH reported intermittent flashback memories regarding feelings she had when Dougherty was around.  (*Id.* at 79-80).  In February 2015, SLH stated that she was ready to process her trauma regarding Dougherty and move on so that she could begin healing from the depression and anxiety symptoms. (*Id.* at 81).  In Sublett's experience, inappropriate behavior like Dougherty's was common among perpetrators of sexual abuse as a way to desensitize a potential victim.  (*Id.* at 83-85).  In March 2015, SLH told Sublett that she wanted to tell her mother, Sheryl Hunt, about the incidents with Dougherty, which she had never discussed with her parents out of

fear.  (*Id.* at 87-90).  At the next session in April 2015, SLH reported that her anxiety had escalated and that she was continuing to have problems with sleeping and nightmares related to Dougherty.  (*Id.* at 90-91).  SLH again reported the same problems in May 2015, but also began to discuss eating disorders that she began experiencing when she was 15. (*Id.* at 91-93).

Sublett further testified that, at a final session on June 1, 2015, SLH reported that she was feeling less depressed, but still had difficulty sleeping.  (*Id.* at 96).  She still had a strong urge to purge after eating, but was attempting to eat smaller portions and was successful sometimes at keeping food down.  (*Id.*).  This was her tenth session with Sublett in 14 months, and in all but one of the sessions, she mentioned Dougherty, although she had never gone beyond discussing his attempts to touch her, sit too close to her, and give hugs.  (*Id.* at 97).  Sublett was concerned because, despite their sessions, SLH seemed to be getting worse rather than better.  (*Id.* at 98).  Near the end of the tenth session, Sublett told SLH that she was concerned that there was something SLH had not shared with her. (*Id.* at 98-99).  SLH began to shake and cry before reporting that Dougherty had raped her. (*Id.* at 99).  According to Sublett's notes, SLH further reported:

> [O]n one occasion when she was still 15 years old, that while her parents were not home, Stephen came out to the swimming pool where she was and asked her to come to his room for some reason, and when she declined, that Stephen pulled her by the arm, her arm, into his room.  [SLH] reports that Stephen started to take his clothes off and was able to ger her clothes off. [SLH] reported that Stephen, quote, raped her.

(*Id.* at 101).  SLH did not actually say that she was 15, but Sublett put that in her notes based on the assumption that this incident occurred just before their counseling

appointments began when SLH's symptoms began to worsen.  (*Id.* at 102).  On June 9, 2015, Sheryl Hunt called Sublett to inform her that SLH had told them about the sexual assault.  (*Id.* at 103).  In her notes, Sublett wrote that "Mrs. Hunt reported to me, also, that this incident had likely happened when [SLH] was 15 years old."  (*Id.* at 103).  On June 15, 2015, Sheryl Hunt told Sublett that SLH had made a report of the incident to the Bee County Sheriff's Office, and Sublett called the DFPS abuse hotline on the same day.  (*Id.*).  On that call, Sublett repeated what was in her notes.  (*Id.* at 104).

On cross-examination, Sublett testified that she first believed that Sheryl Hunt's statement about the incident occurring when SLH was 15 years old was not true after discussing the issue with the prosecutor following the first trial.  (*Id.* at 123-25).  As to her notes from the June 1, 2015, session, Sublett reiterated that SLH never stated that she was 15 years old when the incident occurred, but Sublett assumed her age given the timing of their first therapy sessions.  (*Id.* at 126-27).  She realized that she had made this assumption after discussing it with the prosecutor following the first trial.  (*Id.* at 127).

SLH testified to the following.  (D.E. 5-28 at 5).  When she was six years old, a teenage cousin showed her his penis, but that was all that happened.  (*Id.* at 9).  She went to one counseling session afterwards but had no ongoing issues because of this incident.  (*Id.* at 10).  She first met Dougherty when she was around six years old because he visited their home about every weekend.  (*Id.* at 13).  One time at a pretend tea party when SLH was six years old, Dougherty touched her inner thigh above her knee, which made her uncomfortable.  (*Id.* at 15-16).  Later, after SLH and her family moved to the ranch

Dougherty owned, he had his own bedroom in the house and would visit multiple times a week.  (*Id.* at 19).  Around when SLH was 12, Dougherty sometimes hugged her and made her uncomfortable by pressing up against her.  (*Id.* at 20).  Sometimes he also walked up behind her and caressed her back over the clothes, although he also put his hand under her shirt on one occasion.  (*Id.* at 22).  Dougherty also made her uncomfortable by sitting close to her on the couch even though other seats were available.  (*Id.* at 23).  He did not behave this way when her parents were around, and she never told them about his behavior.  (*Id.*).

SLH further testified that, one day when she was in eighth grade, she was sitting in the backyard by the swimming pool with their dogs.  (*Id.* at 27).  Dougherty approached her and asked if she would come inside, and she said she would in a little bit.  (*Id.*).  SLH was at home at the time because she had a half-day at school.  (*Id.* at 29).  Sheryl Hunt picked her up from school, but then went shopping.  (*Id.*).  A few minutes after speaking with Dougherty, SLH went inside and sat down on a chair in the living room to watch TV.  (*Id.* at 31).  Dougherty approached her and showed her a new book, but he said that he had something else he wanted to show her in his bedroom.  SLH said she would not go to into his bedroom.  (*Id.*).  Dougherty then grabbed her arm and pulled her into the bedroom, locking the door behind them.  (*Id.* at 32).  SLH was 13 years old at the time.  (*Id.* at 33).  Dougherty pushed her against a bookcase and began to remove his clothes.  She knew what he was going to do and tried to stop him, but he pulled up her shirt and pushed her onto his bed.  (*Id.*).  He then removed his pants and her pants, and at one point yelled "I'm so angry."  (*Id.* at 34).  Dougherty then forcibly raped SLH.  (*Id.* at 35, 38).  SLH was eventually able

to kick his leg and get him off her, and she took her clothes and ran to her bedroom.  (*Id.* at 35).  She washed herself off because there was a lot of blood.  (*Id.* at 36).  After observing Dougherty leave the house, SLH went outside and burnt her underwear, which were also bloody.  (*Id.*).  She did not plan on ever telling anyone what happened.  (*Id.* at 37).

SLH further testified that, because of the assault, she suffered from depression and anxiety, including flashbacks and nightmares.  (*Id.* at 39).  She still had nightmares at the time of trial when she was 19.  (*Id.* at 40).  After Sublett indicated that she believed that SLH was not telling her something, that "opened a door for [SLH] to tell her."  (*Id.* at 46).  At this point, SLH told her about the rape.  (*Id.* at 47).  SLH did not believe that Sublett ever asked her how old she was at the time of the rape.  (*Id.* at 48).  When she reported the incident to the police, she told them that she was 13 when it occurred.  (*Id.* at 52).  She was completely sure that she was 13 at the time.  (*Id.* at 53).

Steve Linam, an investigator with the Bee County Sheriff's Office, testified to the following.  (*Id.* at 132).  In June 2015, SLH and Sheryl Hunt came to his office to report that SLH had been sexually assaulted by Dougherty.  (*Id.* at 133-34).  SLH reported a series of touchings that began when she was 7 years old and that ended with a forcible rape when she was 13.  (*Id.* at 135).  The rape occurred on the day her school let out for Christmas break.  (*Id.* at 136).  When Linam first asked SLH when the assault occurred, she said either a couple of years ago or two years ago.  Linam followed up by asking if that meant she was 15 years old when it occurred, but SLH responded that she was 13.  (*Id.*).  Linam did not find this unusual because people often said "a couple years ago" or "two years ago" without

actually thinking about how long it had been, which is why he followed up with the second question to verify her age. (*Id.* at 137-38). During the interview, SLH repeatedly said that she was 13 when the sexual assault occurred. (*Id.* at 139). SLH never gave the exact date that the sexual assault occurred, but Linam determined the date by asking her school what day it let out for Christmas break in 2011. (*Id.* at 140). SLH's report to Linam regarding what happened during the sexual assault was consistent with what she told Sublett and with her testimony at trial. (*Id.* at 141-43). Dougherty denied the rape, although he also denied ever touching SLH's leg despite not being told of that allegation. (*Id.* at 146-48). When Dougherty said this, he also touched one of the officer's thighs. (*Id.* at 147).

Dougherty testified to the following. (D.E. 5-31 at 10). In December 2011, his public ministry terminated because of the letter from Benavides. (*Id.* at 13). He admitted to the allegations in the letter. (*Id.* at 13-14). On cross-examination, Dougherty again admitted to the allegations in Benavides's letter. (*Id.* at 37-39). He acknowledged that, at the time SLH made her allegation, she had no idea that the date she alleged the rape occurred was the same day that Dougherty's leave from priestly ministry commenced. (*Id.* at 74). He maintained throughout his testimony that SLH was lying about everything. (*See id.* at 82-83, 95-96, 101-03, 105-06, 109).

The jury found Dougherty guilty. (D.E. 5-31 at 232). Following the punishment phase of the trial, the jury sentenced Dougherty to 60 years' imprisonment and assessed a fine of $10,000. (D.E. 5-32 at 41).

13

On direct appeal to the Texas Thirteenth District Court of Appeals, Dougherty raised arguments that: (1) his right to confrontation under the Sixth Amendment was violated when the trial court admitted the letter about the previous assault; (2) his Sixth Amendment right to compulsory process was violated when the trial court quashed a subpoena for Visser; and (3) there was insufficient evidence to support that SLH was 13 rather than 15, among other arguments. (D.E. 5-1 at 6, 12, 17-18). As to the confrontation issue, the court concluded that the statements in the letter were nontestimonial because the writer's primary purpose was not a criminal investigation. (*Id.* at 8). Accordingly, the court concluded that Dougherty was not entitled to the protection of the Confrontation Clause. (*Id.*). Second, as to the trial court's refusal to allow Visser to testify, the appeals court concluded that Visser's testimony was hearsay because she could only repeat what a third person told Sublett. (*Id.* at 14). Accordingly, the court concluded that her testimony was inadmissible. (*Id.*). Finally, as to SLH's age, the court recounted the evidence regarding age at trial and concluded that sufficient evidence supported the conviction because the jury resolved any contradictions in the testimony, as it was required to do. (*Id.* at 21-22).

The Thirteenth District Court of Appeals denied Dougherty's motion for a rehearing. (D.E. 5-3 at 1). The Texas Court of Criminal Appeals ("TCCA") refused his petition for discretionary review. (D.E. 5-12 at 1).

Dougherty next filed an application for a writ of habeas corpus in state court under Article 11.07 of the Texas Code of Criminal Procedure. (D.E. 5-36 at 4-22). Dougherty raised the same claims as in his current petition. (*Id.* at 9-16). The trial court failed to act

on the application within 35 days, which constituted a finding that there were no previously unresolved facts material to the legality of Dougherty's confinement. (*Id.* at 187). The TCCA denied the application without written order. (D.E. 5-34 at 1).

## III. DISCUSSION

### a. Standard of Review

A § 2254 petition raising claims that were adjudicated on the merits in state court may not be granted unless the adjudication of the claim: (a) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (b) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decides a case differently than the Court on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Although "unreasonable" is difficult to define, the Supreme Court noted that it is an objective, rather than subjective, standard and emphasized that there is a critical difference between an

unreasonable application of federal law and a merely "incorrect" or "erroneous" application of federal law. *Neal v. Puckett*, 239 F.3d 683, 687 (5th Cir. 2001).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). This is a difficult standard to meet. *Id.* at 102-03.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. Where a state court decides a prisoner's federal claim on the merits in a reasoned opinion, the federal court merely "reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Even summary rulings by state courts are afforded deference under § 2254(d), and in such cases, the relevant question is what arguments or theories could have supported the state court's decision. *Harrington*, 562 U.S. at 99, 102.

If a decision by a state court is silent as to the reasons for the refusal, a federal habeas court can "look through" the decision and evaluate the last reasoned state court decision. *Bledsue v. Johnson*, 188 F.3d 250, 256 (5th Cir. 1999). A state court's factual findings are presumed to be correct and a petitioner has the burden of rebutting the presumption with clear and convincing evidence. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006). This deference extends not only to express findings of fact, but to the implicit findings of

the state court. *Id.* In addition, "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

> b. *False Testimony*

Respondent first argues that Dougherty has not shown that any testimony was false, that the prosecution knew any testimony was false, or that any false testimony was material. (D.E. 6 at 11). Respondent contends that contradictory or inconsistent statements do not alone establish perjury and that Dougherty's allegations are conclusory. Thus, Respondent argues that Dougherty has not shown that the state court's denial of his claim was an unreasonable determination of the facts or contrary to, or an unreasonable application of, Supreme Court precedent. (*Id.*).

Dougherty responds that the prosecution told Sublett to change her testimony to falsely state that SLH was 13 when the assault occurred, showing that the prosecution knew of the age discrepancy and elicited false testimony to resolve the problem. (D.E. 10 at 15). He argues that this change in testimony was relevant to both Sublett's and SLH's testimony, and it affected the jury's decision by making SLH seem more vulnerable while also increasing the punishment range. (*Id.* at 15-16). Given this evidence, Dougherty contends that the state court's denial of his claim without explanation was based on an unreasonable determination of the facts and an unreasonable application of Supreme Court precedent. (*Id.* at 16).

The state violates a defendant's constitutional rights when it obtains a conviction through the use of false evidence, known to be false by the prosecution, or when the state allows false evidence to go uncorrected even if it did not specifically solicit such evidence. *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). A new trial is required if there is any reasonable likelihood that the false testimony could have affected the jury's judgment. *Giglio v. United States*, 405 U.S. 150, 154 (1972). This applies even where the false testimony goes only to the credibility of the witness. *Napue*, 360 U.S. at 269. "To obtain relief, the defendant must show that (1) the testimony was actually false, (2) the state knew it was false and (3) the testimony was material." *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). Contradictory testimony at trial merely establishes a credibility question for the jury, it does not establish that any testimony was perjury. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990). A defendant's counsel "is free to investigate the inconsistencies" between a witness's earlier statements and their statements at trial, but this merely creates a credibility issue. *United States v. Viera*, 819 F.2d 498, 502 (5th Cir. 1987), on reh'g, 839 F.2d 1113 (5th Cir. 1988).

Under Texas law, a person commits aggravated sexual assault of a child if he, regardless of whether he knows the age of the child at the time of the offense, intentionally or knowingly causes the penetration of the anus or sexual organ of a child who is under 14 years old. Tex. Penal Code § 22.021(a)(1)(B), (a)(2)(B).

Here, Dougherty has not shown the state court's denial of his claim was an unreasonable determination of the facts or an unreasonable application of Supreme Court

precedent because he has not shown that there was any false testimony given at trial.  There is no question that there was some dispute regarding SLH's age at the time of the offense. Sublett's notes indicated that SLH was 15, Sheryl Hunt indicated to Sublett that SLH was likely 15, and SLH's initial answer to Linam regarding the time of the offense implied that she was 15.  (D.E. 5-27 at 101-03; D.E. 5-28 at 136-39).  However, Sublett testified that SLH never actually told her when the offense occurred and that it was an assumption on Sublett's part that she was 15.  (D.E. 5-27 at 102, 126-27).  Similarly, Linam testified that he immediately sought clarification from SLH regarding her ambiguous statement, and she stated that she was 13 when the offense occurred.  (D.E. 5-28 at 136-38).  SLH testified at trial that she was 13 when the offense occurred.  (*Id.* at 33, 52-53).  To the extent that there was an inconsistency in the evidence regarding SLH's age at the time of the offense, this was a credibility question for the jury.  *Koch*, 907 F.2d at 531.  Dougherty's counsel was entitled to investigate the inconsistencies and cross-examine the witnesses regarding them, and counsel did so extensively.  (*See, e.g.,* D.E. 5-27 at 123-27); *Viera*, 819 F.2d at 502. For example, Sublett admitted that she concluded that SLH was 13 only after discussing the issue with the prosecution following the first trial.  (D.E. 5-27 at 123-27).  This created a credibility issue, which the jury was free to resolve in favor of Sublett and SLH.

Moreover, the fact that Sublett concluded that she merely assumed that SLH was 15 only after discussing the issue with the prosecution following the first trial does not establish that her testimony was false or that the prosecution knew it was false.  It merely establishes that the prosecution discussed the issue with her, possibly because the

19

prosecution truly believed that SLH was 13. Beyond his general dissatisfaction that the jury believed SLH instead of him, Dougherty has presented nothing that indicates, much less establishes, that there was instead a nefarious explanation for the prosecution's discussion with Sublett. And again, this information was before the jury, which was free to resolve the credibility issue in favor of Sublett and SLH.

Dougherty has not shown that there was any false testimony at trial or that the prosecution knew the testimony was false. *See Faulder*, 81 F.3d at 519. Accordingly, he has not shown that the state court's denial of his claim was an unreasonable determination of the facts or an unreasonable application of Supreme Court precedent.

### c.   *Confrontation Clause*

Respondent next argues that Dougherty has not shown that the Thirteenth District Court of Appeals's conclusion that the statements in the letter were nontestimonial was contrary to, or an unreasonable application of, Supreme Court precedent. (D.E. 6 at 13-14).

Dougherty responds that the trial court overruled his confrontation clause objections before the prosecution gave any response, which was error because the prosecution has the burden under Texas law of showing that the questioned statements are nontestimonial. (D.E. 10 at 17). He contends that this error was harmful because the letter was presented at a prominent time in the trial and the prosecution continued to reference it throughout trial. (*Id.* at 17-18). Further, Dougherty argues that the nontestimonial nature of the letter is not clear given the writer's mixed intentions and Mulvey's immediate notification of the

Bee County District Attorney when he received the letter.  (*Id.* at 18-19).  Accordingly, he asserts that the state court's denial of his claim without explanation unreasonably applied Supreme Court precedent and was based on an unreasonable determination of the facts. (*Id.* at 19).

The Confrontation Clause of the Sixth Amendment provides that: "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Thus, the testimonial statements of a witness may not be admitted at trial unless the witness is unavailable to testify, and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53 (2004). However, nontestimonial statements do not fall under the protection of Confrontation Clause.  *Id.* at 68.  In short, "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (internal quotation marks omitted).

Under the primary purpose test, "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Id.*  "In the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Id.* (internal brackets and quotation marks omitted).  So, for example, statements made during an ongoing emergency are nontestimonial because "an emergency focuses the participants on

something other than 'prov[ing] past events potentially relevant to later criminal prosecution.'" *Michigan v. Bryant*, 562 U.S. 344, 361 (2011), citing *Davis v. Washington*, 547 U.S. 813, 822 (2006).  Similarly, "less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Clark*, 576 U.S. at 245.  In contrast, statements made "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," are testimonial. *Davis*, 547 U.S. at 822.  Statements made to persons other than law enforcement officers can be testimonial and subject to the Confrontation Clause, but "such statements are much less likely to be testimonial than statements to law enforcement officers." *Clark*, 576 U.S. at 246.

Here, Dougherty has not shown that the state court's denial of his claim was an unreasonable determination of the facts or an unreasonable application of Supreme Court precedent because the statements in Benavidez's letter were nontestimonial.  As an initial matter, the letter was written to church officials rather than law enforcement and is therefore "much less likely to be testimonial than [a statement] to law enforcement officers." *Clark*, 576 U.S. at 246.  Further, the primary purpose of the letter was not "to create an out-of-court substitute for trial testimony." *Id.* at 245.  In the letter, Benavidez did not suggest that he sought a criminal or civil legal remedy, but rather stated that he sought to ensure that the church "do all that is in your power and control to ensure Rev.

Dougherty is never in a position to abuse another innocent child." (D.E. 5-33 at 3).[3] Benavidez noted that he "dread[ed] that other children may have suffered at the hands of Rev. Dougherty because I have not made his crimes known to you until now." (*Id.*). He also stated that he wrote the letter "as part of my recovery" with the encouragement of his psychologist. (*Id.*). Moreover, there is no indication in the record that Benavidez ever sought either a criminal or civil legal remedy because of Dougherty's sexual abuse. The fact that Bishop Mulvey contacted law enforcement after receiving the letter has no bearing on the primary purpose of the letter was because Bishop Mulvey did not write the letter.

In short, Benavidez's statements were made to persons other than law enforcement officers and the records indicates that the primary purpose of these statements was not to create an out-of-court substitute for trial testimony, but rather to alert church officials to Dougherty's abuse to protect others and to further Benavidez's own recovery from the abuse. Under these circumstances, Dougherty has not shown that the state court's denial of his claim was an unreasonable determination of the facts or an unreasonable application of Supreme Court precedent.

    *d.*   *Impeachment Witness*

Finally, Respondent argues that the trial court's decision to quash Visser's subpoena was proper because Visser's testimony was inadmissible hearsay and Dougherty has not

---

[3] Nor can it be said that Benavidez's statements were made to create an out-of-court substitute for trial testimony in this case because the letter was written before the date of the sexual assault and long before SLH's outcry in June 2015.

shown that there was a substantial and injurious effect or influence on the jury's verdict as a result.  (D.E. 6 at 14, 17).

Dougherty responds that Visser had specific knowledge that Sublett told DFPS that SLH was 15 to 16 years old at the time of the offense.  (D.E. 10 at 21).  He argues that he needed Visser to testify to establish that Sublett did state that SLH was at least 15 at the time of the offense.  (*Id.* at 21-22).  Dougherty contends that Visser's testimony was for impeachment purposes, and the trial court's ruling prevented him from showing that Sublett had previously claimed that SLH was older than 14.  (*Id.* at 23).  He argues that Visser's testimony would not have been hearsay because it would have been offered for impeachment purposes, not for the truth of the matter asserted.  (*Id.* at 20-21).  Accordingly, he asserts that the state court's denial of his claim without explanation unreasonably applied Supreme Court precedent and was based on an unreasonable determination of the facts.  (*Id.* at 23-24).

When analyzing constitutional trial error on habeas review, courts must determine whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal citation omitted).  Under this standard, a habeas petitioner must establish that the trial error resulted in actual prejudice.  *Id.*  However, this requirement is not a traditional burden of proof. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  Instead, if a federal judge "is in grave doubt" about whether a trial error had a substantial and injurious effect, the error was not harmless.  *Id.*

Here, regardless of whether the trial court should have allowed Visser to testify, Visser's testimony would have been entirely cumulative to other testimony given at trial and Dougherty has not shown that he suffered actual prejudice from the trial court's decision to quash the subpoena. *See Brecht*, 507 U.S. at 637. Visser was a DFPS intake officer who merely received calls reporting claims of sexual abuse. (D.E. 5-27 at 20). The evidence at trial showed that Sublett called the DFPS hotline, spoke to Visser, and reported the abuse consistent with what she had in her notes. (*Id.* at 103-04). Visser had no independent knowledge of the accusations beyond what Sublett reported to her. (*Id.* at 27). Dougherty contends that he needed Visser's testimony to impeach Sublett and SLH regarding whether SLH was 15 at the time of the offense, but Sublett admitted in her testimony that her notes indicated that SLH was 15 and testified that she merely reported what was in her notes to Visser. (*Id.* at 101-02, 104). Visser's testimony would have had no additional impeachment value because Sublett's testimony and notes, which were in evidence, both stated that SLH was 15 at the time of the offense, and all Visser could have testified to was that Sublett told her the same thing based on the same notes. (*See id.* at 25-27; D.E. 10-1 at 11).[4] Ultimately, as discussed above, the contradiction between Sublett's initial notes and her testimony at trial created a credibility issue for the jury to decide. Dougherty was able to impeach Sublett on this contradiction based on her own testimony and notes, and Visser's testimony would have had no additional impeachment value

---

[4] Dougherty attached a copy of Visser's intake report to his response to the motion for summary judgment.

because it was based on the exact same notes. That Sublett repeated what was in her notes when calling the DFPS hotline is not surprising, and even if Visser testified, the ultimate issue would have remained whether the jury found Sublett's explanation for the discrepancy in her testimony and notes credible.

Under these circumstances, even if the trial court erred, that error did not have a substantial and injurious effect or influence in determining the jury's verdict because Dougherty was already able to impeach Sublett and SLH with the same information that Visser could have testified to. *Brecht*, 507 U.S. at 637. Because Dougherty cannot show that he suffered actual prejudice from the trial court's decision to quash Visser's subpoena, he is not entitled to federal habeas relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Dougherty has not yet filed a notice of appeal, the issue of whether he is entitled to a COA will be addressed. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (stating that a district court may *sua sponte* rule on a COA).

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Where a district court rejects the constitutional claims on the merits, the petitioner must show that

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  *Slack v. Daniel*, 529 U.S. 473, 484 (2000).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327.

Here, because reasonable jurists would not find it debatable that Dougherty failed to state a claim for a violation of a constitutional right or failed to show that he suffered actual prejudice from any error, it is recommended that a COA be denied.

## V.   RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Respondent's motion for summary judgment (D.E. 6) be **GRANTED** and Dougherty's habeas corpus petition be **DENIED**.  It is further recommended that a Certificate of Appealability ("COA") be **DENIED**.

Respectfully submitted on June 30, 2022.

Julie K. Hampton
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).